OPINION
On February 22, 1993, Albert Porter was seriously injured when his automobile was involved in a collision with an auto driven by David Tabern. Tabern was at fault in the accident, and had automobile insurance liability limits of only $50,000. Porter's own underinsured motorist coverage limits were $50,000 per person and $100,000 per accident. At the time of the accident, Porter's health insurance carrier was DayMed Health Maintenance Plan, Inc. (DayMed). This health insurance benefit was part of a group plan provided by Porter's employer, the Dayton Power and Light Co. After the accident, DayMed paid out $59,841 for Tabern's medical expenses. An additional $5,000 was paid by Western Ohio Health Care Plan and Porter paid around $8,000, based on the 20% co-pay requirement under the DayMed policy. Porter was off work for nearly a year due to his injuries, and had lost wages of about $39,337.60, including overtime.
On November 15, 1993, Albert and his wife, Carlin, filed a complaint for personal injuries and loss of consortium against Tabern's administratrix. They also filed a declaratory judgment action to resolve issues about underinsured motorists benefits and subrogation claims. Before suit was filed, Tabern's insurer, All America, had offered its liability policy limits of $50,000 to settle the claims against Tabern. Because of subrogation claims asserted by DayMed and Western Ohio against the proceeds of the liability policy, the Porters asked for a judicial determination of the amounts due, if any, to each party. DayMed did not make a claim for money due under the Porters' underinsured motorists coverage. The policy limits of $50,000 on that policy were paid to the Porters, with about one-third of that amount being allocated for attorney fees. The actual amount realized by the Porters after payment of fees and expenses was approximately $26,000.
Trial was held before the court on May 8, 1995, on the issue of how much DayMed would be entitled to under the policy. (Western Ohio's claim had already been settled.) During the trial, the court also received evidence on the value of the Porters' personal injury and consortium claims. Subsequently, on September 15, 1998, the court filed a decision finding that DayMed was entitled to repayment under the terms of its policy, subject to the funds available after payment of a pro rata share of attorney fees and costs. Given that the attorney's contingency fee was one-third, the court divided the $50,000 in the fund as follows: $16,666 for the attorney fees and $33,334 for DayMed, minus the Porters' expenses of suit, including court costs.[1]
(The evidence at trial indicated the litigation expenses were about $1,853, but for some reason the court did not include a specific amount in its entry.)
In its decision, the court also awarded interest from the escrow fund to be divided by contract. In this regard, the court further said that if the interest amount was not determined by contract, it should be divided pro rata according to the recovery formula outlined in the decision. And finally, the court specifically found that Albert Porter had been seriously injured, that Carlin Porter had suffered a loss of consortium, and that the injury and loss of consortium were such that neither would ever be fully compensated in view of the resources available for compensation.
Both sides then appealed the trial court's decision. The Porters raise the following five assignments of error:
I. The Trial Court's judgment allocating any portion of the $50,000.00 escrowed settlement fund to DayMed is against the manifest weight of the evidence, is contrary to law, and constitutes prejudicial error.
II. The Trial Court's judgment in failing to allocate to Plaintiffs from the $50,000.00 escrowed settlement fund any specific amount for "expenses of suit including court costs" is against the manifest weight of the evidence, is contrary to law, and constitutes prejudicial error.
III. The Trial Court's judgment in allocating interest on the escrow account to the favor of DayMed in accordance with the "Contract," i.e., the "Settlement and Escrow Agreement" of "If not determined by contract, then pro-rata according to the recovery formula" is against the manifest weight of the evidence, is contrary to law, and constitutes prejudicial error.
IV. The Trial Court's judgment in failing to allocate any portion of the escrowed $50,000.00 settlement fund to Plaintiff, Carlin L. Porter, for her loss of consortium damages, is against the manifest weight of the evidence, is contrary to law, and constitutes prejudicial error.
V. The Trial Court's judgment in ordering "Plaintiffs to pay costs subject to the Court's decision on escrow determination" is against the manifest weight of the evidence, is contrary to law, contravenes the provisions of Civ. R. 54(D) that ". . . Costs shall be allowed to the prevailing party" and constitutes prejudicial error.
DayMed's cross-appeal contains the following single assignment of error:
I. The Trial Court erred in allocating any portion of the $50,000 escrow settlement fund to Plaintiffs Albert L. and Carlin L. Porter.
After considering the assignments of error, the record, and the applicable law, we find that the trial court erred in allocating any portion of the escrow fund to DayMed. Accordingly, the judgment in favor of DayMed is reversed and final judgment is entered in favor of Albert and Carlin Porter.
 I
According to the DayMed "Certificate of Coverage" issued to Albert Porter:
 [i]f a Member receives benefits or payment when he/she is injured as a result of the neglect or wrongful act of another person or entity (or for any settlement in lieu of adjudicated or agreed to negligence or wrongful act), DayMed HMP may recover the amount we have paid for the Member's injuries from the person who is responsible or from any other insurance company responsible for paying the Member's medical injuries.
 If a Member should sue the person responsible for the injuries and settlement is made, the Member must repay DayMed HMP for the medical expenses previously paid.
 The Member shall reimburse DayMed HMP to the extent of the amounts recovered by said Member as a result of any lawsuit, settlement, or otherwise, less DayMed HMP's pro-rated share of attorney fees and costs sustained by the Member in obtaining a recovery. The Member shall, upon request, execute and deliver such instruments and papers as may be required to do whatever may be necessary to carry out this provision.
 The Member also agrees to execute all papers necessary to allow DayMed HMP to bring suit on his/her behalf, for medical expenses incurred by DayMed.
Based on this subrogation provision, the trial court concluded that DayMed was entitled to recover up to the total amount of the $50,000 fund, minus attorney fees and expenses of suit. In the first assignment of error, the Porters claim the court's decision was against the manifest weight of the evidence and was contrary to law. Relying on Newcomb v. Cincinnati Ins. Co. (1872), 22 Ohio St. 382, James v. Michigan Mut. Ins. Co. (1985), 18 Ohio St.3d 386, and Blue Cross Blue Shield Mut. of Ohio v. Hrenko (1995),72 Ohio St.3d 120, the Porters contend that a subrogated insurer is not entitled to any recovery until the injured party is fully compensated for a loss. In contrast, DayMed relies on Peterson v.Ohio Farmers Ins. Co. (1963), 175 Ohio St. 34, which allows a subrogated insurer who has cooperated and assisted in a recovery to be indemnified first from the proceeds of the recovery.
In an early discussion of subrogation, the Ohio Supreme Court distinguished between situations where an insured had received partial, as opposed to full compensation for a loss. Newcomb,22 Ohio St. 387-88. In Newcomb, Cincinnati Insurance had insured a steamboat that was damaged in a collision with a steamer.22 Ohio St. at 385-86. Cincinnati paid its insureds $1,617.15, and the insureds then recovered $11,086 from the owners of the steamer. However, the insureds' losses, including costs of suit, exceeded $15,000. After Cincinnati brought suit against its insureds for reimbursement of the amount it had paid, the Ohio Supreme Court rejected the claim. In doing so, the court relied on a distinction in the subrogation context between "full insurance" and "partial insurance." In this regard, the court said:
 In case of partial insurance, of which class is the one at bar, the assured and underwriter have each a substantive interest in the claim against the wrong-doer; whereas, in a case of full insurance and compensation, the interest of the former is but nominal.
 Where the assured, as in case of partial insurance, sustains a loss, in excess of the reimbursement or compensation by the underwriter, he has an undoubted right to have it satisfied by action against the wrong-doer. But if, by such action, there comes into his hands, any sum for which, in equity and good conscience, he ought to account to the underwriter, reimbursement will, to that extent, be compelled in an action by the latter, based on his right in equity to subrogation. But the assured will not, in the forum of conscience, be required to account for more than the surplus, which may remain in his hands, after satisfying his own excess of loss in full, and his reasonable expenses incurred in its recovery; unless the underwriter shall, on notice and opportunity given, have contributed to, and made common cause with him, in the prosecution.
Id. at 387-88. Based on this reasoning, the court found that the insureds had no obligation to reimburse Cincinnati Insurance because their losses and costs of suit had exceeded their recovery.
Subsequently, in Peterson, the Ohio Supreme Court distinguished Newcomb. Specifically, in Peterson, Ohio Farmers Insurance had issued a policy of fire insurance on a barn and personal property. 175 Ohio St. at 35. After a fire occurred, Farmers paid its insureds $7,814 and the insureds signed a proof of loss and subrogation agreement. Both the insureds and insurer then jointly filed an action against the wrongdoer for the total amount of the loss (about $17,000), and each employed its own counsel. However, because the jury verdict was only $11,514, a dispute arose about division of the proceeds. The subrogation provision in the policy said that the insurance company could require an assignment of all right of recovery to the extent that payment had been made. Id. at 37. Additionally, the subrogation receipt, signed by the insureds, gave Farmers all right to recover against third-parties up to the extent that payment had been made.
Relying on the subrogation receipt, the court held that Farmers was entitled to priority in payment from the funds recovered. Id. at 38. The court distinguished Newcomb on two grounds — first, that the insured in Newcomb had proceeded against the tortfeasor without the insurer's cooperation and assistance; and second, that no specific subrogation provision or agreement existed in Newcomb. Id.
Later, the Ohio Supreme Court again confronted the subrogation issue in a case involving a written assignment (likePeterson), and a lack of cooperation (like Newcomb). See, Ervinv. Garner (1971), 25 Ohio St.2d 231, 236. In Ervin, the insured signed a subrogation agreement, assigning his rights against the tortfeasor to his insurance company, up to the amount that the insurer had paid. Id. 232. However, the insurer did not participate in the investigation or in the suit against the tortfeasor, beyond filing a motion asking that its subrogation claim be paid. Id. Nonetheless, the court gave priority to the subrogation claim. First, the court found that the issue of cooperation was of no great significance and was not intended to be a general requirement. Id. at 237. Instead, the court felt the important distinction between Peterson and Newcomb was the specific written assignment in Peterson. Id. Accordingly, the court found that the insurer was entitled to be paid first from the proceeds, even though they were insufficient to satisfy the claims of both the insured and the insurer. Id. at 237-239.
In 1985, the Ohio Supreme Court followed Newcomb in a case involving subrogation and underinsured motorists benefits. James, supra, 18 Ohio St.3d 386. In James, the insured sustained damages in excess of $37,500 in an auto accident. The insured had underinsured motorists coverage with Michigan Mutual, which paid $12,500 of its $25,000 limits. However, Michigan Mutual rejected payment of the rest of the limits, claiming it was entitled to set off $12,500 that had been paid by the tortfeasor's liability carrier. The first argument Michigan Mutual made to support the claim for set off was that the subrogation provision in its insurance policy allowed deduction of the amounts the insured received from the tortfeasor. Like the subrogation clauses inPeterson and Ervin, the clause in James required the insured to reimburse the company to the extent of any payment made. Id. at 388. Furthermore, this reimbursement was to be made from the proceeds of any recovery the insured received.
The Ohio Supreme Court rejected Michigan Mutual's subrogation claim, citing the "established general rule of subrogation * * * that where an insured has not interfered with an insurer's subrogation rights, the insurer may neither be reimbursed for payments made to the insured nor seek setoff from the limits of its coverage until the insured has been fully compensated for his injuries. Id., citing Newcomb v. Cincinnati Ins. Co. (1872),22 Ohio St. 382 (emphasis in original).
Ultimately, based on the content of the underinsured motorists provisions and its interpretation of the public policy behind R.C. 3937.18(C), the court did allow Michigan Mutual to "setoff" the payments received against the limits of its underinsured motorists coverage. Id. at 388-390. However, this was not due to the subrogation clause, but was a result of policy definitions which clearly and unambiguously allowed the "limits of liability" for underinsured motorist coverage to be set off by payments made on behalf of persons who were legally responsible for the injury. Id.
The final relevant decision of the Ohio Supreme Court in this context is Hrenko, supra, (1995), 72 Ohio St.3d 120. In Hrenko, the court said in its syllabus that:
 [p]ursuant to the terms of an insurance contract, a health insurer that has paid medical benefits to its insured and has been subrogated to the rights of its insured may recover from the insured after the insured receives full compensation by way of a settlement with the insured's uninsured motorist carrier.
Id. at 120. Factually, Hrenko involved health benefits paid by Blue Cross Blue Shield on behalf of its insured and the insured's settlement with his uninsured motorist carrier for damages sustained in an auto accident with an uninsured driver. The amounts paid by Blue Cross were not mentioned in the decision, nor were the limits of the uninsured motorists policy discussed. However, the facts of the case indicate that the insured settled with his uninsured motorists carrier for $42,000 and Blue Cross then sought reimbursement from this amount for the medical benefits it had paid. Id. After the trial court granted summary judgment to the insured, Blue Cross appealed. The court of appeals reversed, finding in favor of Blue Cross, and further appeal was taken to the Ohio Supreme Court.
Like the policy in the present case, the Blue Cross policy provided for repayment of the amount of benefits provided by Blue Cross. Although the insured argued that this provision violated public policy by interfering with his contract for underinsured motorists benefits, the Ohio Supreme Court disagreed. Instead, the court found that circumventing the subrogation clause would place the insured in a better position than he was before the accident. Consequently, because the insured received the full benefit of his bargain with both insurers, the court held that the subrogation provision did not improperly reduce his recovery. Id. at 123. As was noted, the court also stated in its syllabus that a subrogated insurer may recover from the insured after the insured receives full compensation by way of settlement from his uninsured motorist carrier. Implicit in this statement is the concept that the insurer may not recover from the insured unless the insured has received full compensation for his injuries.
After Hrenko, two lower courts have refused to enforce subrogation clauses where the result would be that the insured receives less than full compensation. First, in Central ReserveLife Ins. Co v. Hartzell (Nov. 30, 1995), Tuscarawas App. No. 94AP120094, unreported, the Fifth District Court of Appeals rejected the subrogation claim of a health insurer which had paid $19,512.29 in medical bills under a policy of group health insurance. The insureds received $25,000 from the tortfeasor's insurance and actually received about $16,000 after payment of attorney fees and expenses. Moreover, even though the insureds also received $70,000 from their underinsured motorists coverage, their total claim was determined to be worth about $140,000, i.e., the gross sum of $95,000 that they stood to receive would not fully compensate for their injuries.
Under these facts, the Fifth District Court of Appeals concluded that the subrogation clause was unenforceable and "contrary to public policy as announced in Hrenko." Id. at p. 3. In particular, the court focused on the fact that the judgment of the trial court required the insureds to pay part of their medical bills that were covered under the policy, to the extent that they paid more than they received from the tortfeasor. Specifically, the court stressed that:
 [t]he purpose of insurance is to protect individuals from injury by permitting them to contract with insurance carriers. The carriers calculate and distribute the risks and liabilities and set premiums. In the case at bar, Blue Cross has accepted premiums in return for the assurance that appellants would be protected in the event they incurred medical expenses. The subrogation clause subverts this by giving Blue Cross's claims priority over the injured party's claims.
Id.
Subsequently, in Moellman v. Niehaus (Feb. 5, 1999), Hamilton App. No. C-971113, unreported, the First District Court of Appeals stated that it found the reasoning in Hartzell persuasive. Id. at p. 3. Like Hartzell, Moellman involved a subrogated party's attempt to obtain reimbursement for benefits paid even though the insureds would not be fully compensated for their injuries via collection from the tortfeasor or from their own underinsured motorist carrier. In finding that the insureds' claim had priority over the subrogation claim, the court emphasized that the insureds were not receiving any type of windfall. Id.
We agree with the reasoning of the Fifth and First Districts. The recent trend in the Ohio Supreme Court's thinking is that subrogated interests will not be given priority where doing so results in less than a full recovery for the insured. Hrenko,supra, and James, supra. This approach makes logical sense, is equitable, and is also consistent with the court's earliest pronouncement on the subject, which distinguished between situations in which the insured retains a substantial interest (partial insurance or compensation) as opposed to retention of a nominal interest (full insurance or compensation). Newcomb,supra, 22 Ohio St at 387-88. Logically, if an insurer pays less than the full amount of a loss and the insured receives less than full compensation from all sources, there is no reason why the insurer's interest should be given priority. In this type of situation, the insured is not receiving a surplus or windfall at the insurer's expense. To the contrary, even if the insurer is not given priority, the insured still faces inadequate compensation for his injuries.
The present case illustrates such a set of facts. Allowing DayMed's claim to receive priority would mean that the Porters would recover nothing from the party responsible for the accident. Admittedly, the $26,000 they received from their underinsured motorists coverage ($50,000 less attorney fees and expenses of suit) is not adequate to compensate for their losses, which include $39,337.60 in lost wages, about $8,000 in out-of-pocket medical expenses, pain and suffering, permanent injuries (including one leg which is two inches shorter than the other as a result of the accident), and loss of consortium. As we noted, the trial court explicitly found that the Porters will never be fully compensated for their losses in view of the available resources. Accordingly, based on the authority discussed above, the DayMed subrogation clause is unenforceable, since it operates to deprive the Porters of the full benefit of their bargain.
We note that in oral argument, DayMed relied heavily on thePeterson case, arguing that DayMed's claim should be given priority because DayMed actively cooperated in allowing recovery from the tortfeasor. To the extent that Peterson retains vitality after the later decisions of the Ohio Supreme Court in James andHrenko, it is factually distinguishable from the present case. Specifically, in Peterson, the insurer jointly filed for damages against the tortfeasor and collaborated in conducting the litigation, including a jury trial against the tortfeasor.175 Ohio St. 34. This type of active cooperation is different than what occurred in the present case, where DayMed merely notified the tortfeasor's insurance company of its subrogation lien and then filed an answer and counterclaim for declaratory relief after suit was filed by the Porters. Further, the documents filed in the trial court reveal that the tortfeasor's insurer had already agreed to tender its full policy limits before DayMed participated in the suit.[2] And, as we stressed earlier, the trial court expressly found that the Porters' counsel was the primary source for obtaining the recovery. Since DayMed admittedly did nothing to investigate the accident and the tortfeasor's insurer offered full payment of its limits before DayMed was involved in the legal action, it could be said, in fact, that the Porters' counsel was the only source for obtaining the recovery. We note further that in its brief, DayMed relied on an "escrow agreement" between the Porters and DayMed which allowed the $50,000 received from the tortfeasor's liability insurer to be deposited into court. According to DayMed, the Porters admitted in this escrow agreement that DayMed "cooperated and assisted" in recovering the settlement. In this regard, the language DayMed focuses on says that:
 [b]y this agreement the parties hereto intend only to facilitate settlement of the claims of ALBERT L. PORTER and CARLIN L. PORTER against the estate of David O. Tabern, Sr., Deceased, and receipt of the proceeds of said Estate's liability insurance policy with ALL AMERICAN INSURANCE CO. without waiving or modifying their respective rights and pending claims for declaratory relief as set forth in the above-referenced legal action.
We do not view the above statements as an "admission" that DayMed cooperated and assisted for purposes of Peterson or the other cases referred to in our opinion. Clearly, all the parties intended by this language was to eliminate an unnecessary party without affecting or waiving their existing rights to the insurance funds.
Accordingly, we conclude that even if Peterson retains validity, it is inapplicable to this case, meaning that DayMed's claims would not take priority over those of the Porters.
Based on the preceding discussion, the Porters' first assignment of error is sustained.
 II
In the remaining four assignments of error, the Porters attack the judgment on various grounds, including the trial court's failure to designate a specific amount for expenses of suit; the court's division of interest on the fund; the court's failure to include an allocation for Carlin Porter's loss of consortium, and the court's violation of Civ. R. 54(D) in ordering the Porters to pay costs. Given our decision that the Porters are entitled to the entire $50,000 proceeds in the fund, including interest which may have accrued, the remaining assignments of error are moot. Likewise, DayMed's cross-assignment of error, contesting the trial court's award of attorney fees, is moot. In light of the preceding discussion, the judgment of the trial court is reversed and final judgment is entered in favor of the Plaintiffs/Appellants.
FAIN, J., concurs.
[1] The court specifically found that counsel for Plaintiffs was the primary source for obtaining the $50,000 recovery in this case.
[2] This allegation is contained in paragraph 12 of the Porters' complaint and is admitted in the answer filed by Tabern's administratrix.